QUINCY DAIRY CO. v. HARTFORD ACCIDENT & INDEMNITY CO.

Civil Action No. 368.

District Court, S. D. West Virginia.

Nov. 9, 1944.

Payne, Minor & Ray, of Charleston, W. Va. (by John V. Ray, of Charleston, W. Va.), for plaintiff.

Steptoe & Johnson, of Charleston, W. Va. (Stanley C. Morris and E. Loyd Leckie, both of Charleston, W. Va., of counsel), for defendant.

MOORE, District Judge.

This case grows out of the death of a pure bred Guernsey bull named Coronation

Illustrious, belonging to the plaintiff Quincy Dairy Company (hereinafter called "Quincy"). Quincy claims that the bull was covered by a contract of mortality insurance with the defendant Hartford Accident and Indemnity Company (hereinafter called "Hartford") in the amount of $5,000. Hartford denies that there was any coverage, and further avers that, even so, Quincy failed to comply with certain conditions precedent to recovery.

Quincy owns and operates a herd of pure bred Guernsey cattle which it has been developing as such for more than fifteen years. Its president and manager, John L. Dickinson, started the dairy in the year 1922 in partnership with another man, but soon afterwards acquired his interest, and after that the business was entirely in the hands of Dickinson.

In the summer of 1943 Dickinson heard of the bull, Coronation Illustrious, and together with one Robertson, an expert veterinarian employed by Quincy, began extensive investigation into his merits. They traveled all over the State of Indiana, looking at daughters of the bull and inquiring into their record of milk production. Having become satisfied that he was sound and that he was especially desirable for breeding cows that would produce large quantities of milk, Dickinson eventually purchased the bull, together with a cow valued at $300, for the sum of $4,000. Altogether, including the expenses incident to the investigation, the bull cost Quincy approximately $5,000.

Having bought the bull, Dickinson desired to have it covered by insurance in the amount of $5,000. Quincy's secretary, Fred Sarles, on Dickinson's instructions, started negotiations with one Henry D. Litaker, an agent of Hartford in Charleston, West Virginia. The bull was six and one-half years old and Quincy wished to have it insured for the remainder of its insurable life, or approximately five and one-half years. Litaker, who seems to have been unacquainted with Hartford's general policy with reference to insuring livestock for specific periods of time, found it necessary to make inquiry of his home office. A correspondence was opened on this subject on September 22, 1943, which continued over a period of several days. Meanwhile, since the bull was then located near Indianapolis, Indiana, whereas the Dickinson herd was at Quincy, near Charleston, West Virginia, it was necessary to ship the bull to Quincy, and for this purpose Litaker suggested that he would get a binder from Hartford for the issuance of a single trip transit policy. This was done by an exchange of telegrams between Litaker and one W. H. Timmons, General Agent of Hartford's livestock insurance division. These telegrams were worded as follows:

Litaker's telegram dated September 25, 1943:

"Please bind immediately single trip transit purebred registered Guernsey bull five thousand dollars Quincy Dairy Company shipping from farm near Indianapolis to Quincy near Charleston Railroad Freight. Please acknowledge. Thanks."

Timmons reply telegram dated September 27, 1943:

"Binding insurance usual conditions shipment Quincy bull your wire. Forward application."

Quincy signed an application for the single trip transit insurance dated September 25, 1943, which was received by Hartford on October 5, 1943. The single trip transit policy was mailed by Timmons to Litaker on October 7, 1943, and was delivered to Dickinson on October 14, 1943. The bull itself had been delivered at Quincy, West Virginia, on September 29, 1943. No premium was paid at the time, nor was any charged to Quincy on Litaker's books until the policy was received on October 7, 1943.

Timmons' letter to Litaker enclosing the single trip transit policy contained the following paragraph:

"Had an annual policy been applied for at the time the coverage was bound, the bull would have been covered with the transportation hazard included. However, now that the trip has been completed, the premium is considered fully earned and would not be applied against an annual policy, if desired."

Dickinson and Sarles were under the impression that the single trip transit policy was effective for thirty days after arrival of the bull, but on October 13, 1943, they learned in some way that this impression was erroneous and that the bull had been uninsured since arrival. Thereupon, Sarles requested Litaker to insure the bull by means of a binder, and Litaker replied that he could and would get a binder. Sarles signed an application for $5,000 of insurance on Hartford's printed form "D," which was partially filled out

in typewriting before it was signed. Litaker then sent the following telegraphic night letter to Timmons, dated October 13, 1943:

"Quincy Dairy have decided to insure bull you recently covered for transit from Indianapolis on annual basis with transit endorsement. Please cover accordingly and if possible date policy date of transit binder. If not possible bind full coverage since arrival. If further application necessary will forward. Please acknowledge."

Instead of responding by telegraph, Timmons wrote Litaker the following letter on October 14, 1943:

"We have your wire of October 13 requesting coverage on the · bull recently covered under Single Trip Transit Policy No. 153754.

"As explained in our letter of October 7 it is not possible to date a new annual policy as of the inception date of the single trip contract, since the premium under that policy is considered fully earned and all liability terminated at the time the animal was unloaded.

"A Form 'D' application and Health Certificate are enclosed. The rate for an annual full coverage policy including transportation is $7.50 per $100.00 of insurance."

Litaker was not produced as a witness because of illness, but the foregoing letter from Timmons to him dated October 14, 1943, bears the following memorandum to his secretary in Litaker's handwriting:

"Just ask Sarles to have the health cert. completed & send back to us, and ask him by phone any questions you cannot fill in on the "D" App. he has signed already."

The application referred to, which, as stated, had already been partially completed in typewriting, was later filled out by Sarles in his own handwriting about the 16th or 18th of October, 1943, and was sent to Timmons by Litaker on October 19, 1943. Instead of a health certificate on Hartford's form, Sarles supplied a certificate made in Indiana by one Charles C. Dobson, a veterinarian, at the time the bull was tested for interstate shipment. This certificate Timmons declined to accept. He returned the application and certificate to Litaker on October 21, 1943, in a letter containing the following pertinent paragraphs:

"It will be necessary that one of the company's Health Certificates be used, since the certificate furnished merely indicates that the animal is free from communicable disease.

"Therefore, when the application is again submitted, accompanied by a regular Health Certificate, one of which is enclosed, it will have our further consideration."

This letter and form of certificate were delivered to Sarles on October 23, 1943. On October 22, 1943, the bull had become ill with pneumonia, although Sarles did not learn of this fact until the morning of October 24, 1943. As soon as he did learn of the bull's illness, Sarles informed Litaker's secretary thereof (Litaker being ill at that time) and inquired whether the bull was bound. The secretary replied that she believed the bull was not bound. Thereafter, despite Quincy's efforts through the best medical attention available to save the bull, it died on October 29, 1943. Quincy did not give notice in any manner directly to the main office of Hartford that the bull was ill until after its death.

It is obvious that the main question presented for decision is whether or not there was a contract of insurance between Hartford and Quincy covering the bull on the date it became ill. If not, Hartford's other defenses to the action need not be considered. Quincy contends that under Litaker's authority as agent of the company he could and did bind the insurance by his own agreement; or, if that contention be not sustained, that the letter of Timmons dated October 14, 1943, must be interpreted as a binder. Hartford maintains that Litaker was not authorized either expressly or impliedly to bind insurance, and that Timmons' letter, instead of being a confirmation of the binder, was in fact a rejection.

It appears that the parties differ markedly in their conception of what constitutes a binder where livestock mortality insurance is concerned. Hartford likens it to the so-called binder or binding receipt which is sometimes given by agents writing life insurance. In such cases the risk is not absolutely bound, but only upon condition that the insured be found in good health by the insurance company's examining physician at a date later than that of the binding receipt, and that a policy be delivered; and such conditions are ordinarily expressed in the binding receipt. Quincy, on the other hand, argues that a binder for livestock mortality insurance is analogous to that issued by fire insurance companies;

and that all that is necessary is proof that the parties agreed upon the essential terms of the insurance; that is, the identity of the animal, the amount of the policy, its date and term, the premium rate, and the risks insured against, with the condition always present that the animal be in good health at the time the binder becomes effective.

■ I have been furnished with little authority that is helpful in defining the essential terms and scope of a binder for livestock mortality insurance; but I am of opinion that Quincy is correct in its conception of the law in respect of such a binder. It is a temporary form of insurance coverage and is always so understood by the parties. It is to be later superseded by a policy, and upon delivery of the policy the parties are, of course, bound by all of the specific policy provisions; but during the interim, the insurance, if actually bound, is in force, subject only to such conditions and restrictions as may have been agreed upon, together with such other usual conditions as are required by good faith and fair dealing on the part of both the insurer and the insured.

True, an application for a policy is usually submitted in connection with the agreement or binder, but the binder itself is a contract of insurance and can be said to include only such terms and conditions as the parties had in mind in making the agreement.

I proceed then to examine the documents introduced in evidence in the light of the surrounding circumstances and with the purpose of determining whether or not Hartford agreed to bind mortality insurance on the bull at a time when the bull was in good health.

■ The contention that Litaker himself bound the insurance may be disposed of briefly. Litaker's contract with Hartford gave him authority "to receive and accept proposals for insurance covering such classes of risks as the company may from time to time authorize to be insured;" and it may be that Litaker was thus empowered to agree upon binders for insurance, notwithstanding the negation of any such power which is expressed in the company's official printed manual. However, I cannot conclude that Litaker purported to act on his own authority in this transaction, nor did he say or do anything which would be calculated to lead Sarles to be-

lieve that he was so acting. Hence the question of whether or not he was authorized to make such an agreement for Hartford becomes immaterial, and I pass to the only pertinent inquiry: Did Timmons, the general agent of Hartford, confirm Litaker's request for a binder?

It will be noted that Hartford had already expressed a willingness to insure the bull, for Timmons wrote Litaker on October 7, 1943, that "had an annual policy been applied for at the time the coverage was bound, the bull would have been covered with the transportation included." Nothing had occurred between October 7 and October 14 which might be expected to cause any change in the attitude of Hartford toward the insurance. Litaker's telegram of October 13 requesting confirmation of a binder was couched in the alternative in respect of only one element of the required insurance, namely, the effective date of the policy to be issued, which would supersede the binder. He asked (and this was done at Litaker's own suggestion and not that of Sarles) that Hartford "if possible date policy date of transit binder." It was explained by Sarles that this suggestion was made by Litaker in the belief that the separate rates for the single trip transit policy and the annual policy might be combined into one rate and thus save Quincy something on the amount of the premium. Litaker's telegram continued: "If not possible bind full coverage since arrival. If further application necessary will forward."

It is pointless to surmise what reply Timmons might have made had Litaker's telegram been a simple request for an immediate binder. Doubtless it would have taken the form of a telegram, binding the insurance on the "usual conditions," as was done on the former occasion. But I must deal with circumstances as I find them. The request for a pre-dated binder brought about a variation in the usual procedure. Instead of sending a telegraphic confirmation, Timmons wrote a letter. It answered that part of Litaker's wire which requested that the policy be dated, if possible, as of the same date as the transit binder. Timmons said that was not possible. The last sentence of the telegram referring to the necessity of a further application is answered by the last paragraph of Timmons' letter. The alternative request, "if not possible bind full coverage since arrival," is not answered expressly. Is an affirma-

tive answer to this request implicit in the letter, taken as a whole?

 I think not. After a careful study of the Timmons letter I am of opinion that it cannot be interpreted to mean that Hartford agreed to bind insurance on the bull "since arrival." No contract of insurance is complete unless all the essential terms are agreed upon. Meadows v. American Eagle Fire Ins. Co., 104 W.Va. 580, 140 S.E. 552. One of the essential terms is its effective date. Quincy, through Hartford's agent, Litaker, had asked that the insurance be bound, not as of the date of the telegram, but as of a date more than two weeks earlier. Certainly this was an unusual request. Had it been different—had the alternative request been for a binder to take effect as of the date of the telegram—it might be argued with some force that Timmons' letter was a confirmation of the alternative request. But to pre-date an insurance contract is a procedure so foreign to the business of mortality insurance that an agreement to do so cannot be presumed from mere silence. See Whitman v. Milwaukee Fire Ins. Co., 128 Wis. 124, 107 N.W. 291, 5 L. R.A.,N.S., 407, 116 Am.St.Rep. 25.

Mere silence on the part of an offeree, or his failure to accept the offer promptly can never be construed as an acceptance, unless there is some duty resting on the offeree to reply or accept. 17 C.J. S., Contracts, § 41, at page 375. I am of opinion that no such duty existed here.

Timmons' letter of October 21 indicates that he did not intend to bind the insurance by his letter of October 14. It must be borne in mind that on October 21 the bull was still in good health, and there was no reason on that date for Timmons' failure to recognize the existence of a binder, if in fact a binder were then in effect. Yet Timmons made no reference to any existing contract of insurance. On the contrary, he used language which, in my opinion, is inconsistent with any idea on his part that such a contract was in effect, when he said, "Therefore, when the application is again submitted, accompanied by a regular Health Certificate, one of which is enclosed, it will have our further consideration." This language can only mean that it was the application, not the Health Certificate, which was to have Hartford's further consideration.

It is contended by Quincy that Hartford is estopped to deny the existence of a binder, because Quincy assumed from Timmons' letter of October 14 that the bull was bound, and therefore took no steps to procure insurance elsewhere. I have already expressed the opinion that Timmons' letter, fairly interpreted, did not confirm Litaker's request for a binder. Hence, there is no act of Hartford on which Quincy's contention of estoppel can be based. Nor do the circumstances shown in evidence indicate that Quincy relied fully on the Timmons' letter as confirmation of a binder. It was only after the bull became ill that Sarles inquired of Litaker's secretary whether the bull was bound. Surely such an inquiry would not have been made if Sarles believed at the time that he had prior assurance from the general agent that the bull was bound.

From a consideration of the testimony and exhibits in their entirety, I am of opinion that no insurance contract covering the bull, Coronation Illustrious, existed or was in effect at any time after the bull was delivered at Quincy on September 29, 1943.

Therefore, the complaint will be dismissed.